IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMANDA YOUNG,

                    Plaintiff,                              OPINION and ORDER

        v.
                                                              23-cv-729-amb
MONROE COUNTY,

                    Defendant.

Plaintiff Amanda Young, a former 911 dispatcher for defendant Monroe County, has a child with epilepsy. She claims that defendant unlawfully discriminated against her by failing to promote her to a full-time dispatcher position and ultimately terminating her employment based on unfounded assumptions that her disabled child would distract her from work, in violation of Title I of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101, and Section 504 of the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 701. She also claims that the county interfered with her right to take leave and retaliated against her for taking leave under the Federal Family and Medical Leave Act (FMLA), 42 U.S.C. § 2611.

The county seeks summary judgment on all of Young's claims. Dkt. 21. The court has considered the parties' filings, including Young's sur-reply and the county's sur-sur reply. Dkts. 35 & 36-1. For the following reasons, the court GRANTS defendant's motion with respect to Young's ADA claims, Rehabilitation Act claim, and FMLA interference claim and DENIES the motion with respect to her FMLA retaliation claim.

JURISDICTION

The parties have consented to jurisdiction by a United States Magistrate Judge. Dkt. 10. The court has original jurisdiction over Young's statutory claims because they arise under federal law. 28 U.S.C. § 1331.

UNDISPUTED FACTS[1]

**A. The parties and background**

Plaintiff Amanda Young is a Wisconsin resident with three minor children. Her son, J.K., has epilepsy and suffers from seizures.[2] His condition is well known in the community because the family holds fundraisers for his care.

Defendant Monroe County runs a 911 Communications Center, which is open continuously 24/7. The county employs thirteen people as full-time dispatchers and relies on on-call dispatchers to cover open shifts. On-call dispatchers do not have a set schedule, do not receive benefits, and are not guaranteed full-time employment. Dispatchers must be present in the center to adequately perform their duties.

Although the Communications Center generally does not receive federal funding, plaintiff asserts the county received federal funding under the Coronavirus Aid, Relief, and Economic Security Act, 116 P.L. 136, and distributed some of those funds to the

---

[1] I find the following facts are material and undisputed, unless otherwise noted, based on the parties' briefing, their proposed factual findings, responses, replies, and objections, and considering the evidence of record in the light most favorable to Young as the non-moving party. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

[2] There is no medical expert testimony in the record regarding J.K.'s condition, but the court assumes for purposes of this motion that his condition qualifies as a disability under the applicable statutes.

Communications Center under the Monroe County American Recovery Plan passed on February 23, 2022. Defendant disputes when the funds were actually distributed and how they were used.

**B. Young's employment at the Communications Center**

Young began working at the Communications Center as an on-call dispatcher in January 2016. She signed a letter of understanding at that time stating that the "casual" on-call position did not entitle her to special consideration for a full-time position, that she could be terminated at any time, and that she was not eligible to participate in any benefit program other than those that were statutorily required. Dkt. 23-28. Under this arrangement, the center would send out a list of available hours to on-call dispatchers and then those dispatchers, including Young, would send back a list of what hours they would cover. Young became a full-time dispatcher about three months later and typically worked the 7:00 a.m. to 7:00 p.m. shift.

**C. Young's use of FMLA and other leave**

Young was the primary caregiver for her children while working at the Communications Center and used FMLA and other types of leave during this time. In 2017, Young was approved for and used 23 hours of FMLA leave.[3] In 2018, she was approved for and used 47.5 hours of FMLA leave. In 2019, J.K. suffered his first seizure, and his condition required Young to take more time off to take care of him. She also gave birth to her youngest child in 2019. That year, Young was approved for and used a total of 510 hours of FMLA leave as well as 50.5 hours of leave without pay, 65.6 hours of approved sick leave, and 61.5 hours of vacation.

---

[3] An employee becomes eligible for Wisconsin FMLA leave after working at least 1,000 hours in the preceding 52 weeks. Wis. Stat. § 103.10(2)(c). She becomes eligible for federal FMLA leave after working at least 1,250 hours in the preceding 12 months. 29 U.S.C. § 2612(a)(1)(C).

In 2020, Young used 326.5 hours of leave without pay in addition to 87 hours of approved sick leave and 73 hours of vacation, but did not use FMLA leave.

In 2021, Young was approved for 412.5 hours of FMLA leave, as well as 121.5 hours of leave without pay, 53 hours of sick leave, and 66.5 hours of vacation. She exhausted her approved hours. *See* Dkt. 23-8 at 40–46 (showing use of leave in 2021). Of that leave time, she used 84 hours of FMLA leave in February, 36 hours of leave without pay in August, and another 60 hours of FMLA leave in October to care for J.K. Young also claims she used some FMLA leave in November 2021 to care for J.K. while he was hospitalized but does not indicate how much leave she used. Dkt. 31, ¶ 33. Her timesheet indicates that she used .5 hours of FMLA leave on November 29, 2021, Dkt. 23-8 at 46, but the county disputes that this FMLA leave was used for J.K., noting that he was hospitalized in October.

When Young took leave, other dispatchers covered her shifts, including other full-time dispatchers, who at times had to work longer hours. Young knew that some of her coworkers were upset about having to cover her shifts. In March 2019, Young exchanged text messages with a coworker about two other coworkers who were contemplating contacting human resources about Young's use of leave. Dkt. 23-26. On April 12, 2021, two of Young's coworkers sent an email to Human Resources Director Ed Smudde complaining that Young's use of leave had become an "issue" because Young was calling out for weeks at a time and it was not "fair" to those who had to cover her shifts. Dkt. 17-2 at 2. Young's coworkers acknowledged that Young had "a lot going on," but stated that "the system is being abused" without consequence. *Id.* The record is unclear as to what, if any, action was taken in response.

**D. Young's interactions with her supervisor**

Michael Thompson became the director of the Communications Center in June 2021. As director, Thompson was involved in providing disability accommodations and processing leave requests for his dispatcher supervisees. Young told Thompson about J.K.'s epilepsy within the first few weeks of his tenure, explaining that she was working with a treatment specialist in Madison, Wisconsin and would need to take time off.

Thompson communicated with Young regarding leave and shift coverage within the first couple of months as director. On August 30, 2021, Thompson reached out to Young to ask if she could cover another dispatcher's shift the following day. Young declined, explaining that J.K. had medical appointments that day, and Thompson responded: "I am wishing the best for [J.K.]. Take care." Dkt. 23-24 at 2. When Young sent Thompson an email with dates that she anticipated needing FMLA leave for a planned hospitalization for J.K. in October 2021, Thompson thanked Young "for the update" and said: "I want you to know that [sic] do not worry about the work schedule, family comes first and [J.K.'s] needs are above all. Take care and I wish [J.K.] and your family all the best." Dkt. 23-25 at 2. Then, on October 7, 2021, Young told Thompson that she would need to take FMLA leave for about 10 days and Thompson responded: "I hope all is well for you and the family. We will make things work. Take care of yourself and [k]eep in touch." Dkt. 23-24 at 2.

Thompson's messages of support aside, Young testified that Thompson's demeanor and "the way he spoke" to her in person regarding leave requests did not convey a supportive attitude. Dkt. 18 at 113:16–17. Young described Thompson's in-person responses as "[s]traight-faced, just visibly unhappy, or if I had called him to take off, it was the big huff,

5

and then, 'Okay,' and that was it." *Id.* at 113:19–21.  She admits, however, that Thompson never stated that he did not want to approve her leave requests.  *Id.* at 113:10–12.

### E.  Young's 2021 resignation from full-time and transition to on-call

J.K.'s treatment needs increased mid-2021, and Young submitted a letter of resignation on November 29, 2021.  In the letter, she explained she had accepted a position with a victim advocacy organization that "offers higher pay, flexible hours, no weekends, and no required overtime" and would "be better for [her] family life."  Dkt. 23-10.  Young worked 12-hour shifts on December 13 and December 14 before her resignation took effect on December 14.

At Young's request, the center placed her on the on-call dispatcher list after she resigned from full-time employment.  The schedule published on December 18, 2021, shows that Young signed up to work on nine days in January 2022, but she ultimately did not work any of these shifts because she was quarantining with her children, who had tested positive for Covid-19.  Young called in to the center on December 31, 2021, to give notice that she would be unable to work because of her children's illnesses, but the parties dispute whether Young gave notice for some or all of her January 2022 shifts.

Young was scheduled to work two shifts in February 2022.  On February 11, 2022, Young left after working 1.25 hours of her 2-hour shift to provide coverage for her family's cab business.  A co-worker agreed to cover the remainder of her shift.  Young testified that Thompson was sitting next to her and overheard her conversation with her co-worker and did not express disapproval until her termination.  On February 21, 2022, Young texted another co-worker that morning to cover her 4-hour shift, and the co-worker, who was coming off a 12-hour shift, agreed.  Young could not recall why she missed this shift.

Thompson testified at his deposition that by early 2022, dispatchers were supposed to bring requests to swap or cover shifts to him and that Young should have sought prior authorization from him regarding shift coverage. Dkt. 20 at 58:8–19. Young testified that Thompson raised no attendance concerns with her at the time and that dispatchers had an existing practice of swapping shifts amongst themselves, Dkt. 18 at 49:13–50:20 & Dkt. 28, ¶ 17, but she also acknowledged that she was unsure how shift coverage was supposed to be addressed under Thompson's supervision, Dkt. 18 at 47:13–15 & 84:11, and that he had decided at some point that dispatchers should call him directly if they had to call out of a shift, *id.* at 50:6–10.

## F. Young's children contract Covid-19

Young's children contracted Covid-19 in succession beginning on December 6, 2021, when her daughter, M.K., tested positive. J.K. tested positive on December 11, 2021, and again on January 2, 2022. Then, her youngest child, S.Y., tested positive on January 10, 2022.

Young does not claim that she tested positive for Covid-19 during this time, and she stayed home with her children. She agreed that on the one hand, her daughter and youngest child's diagnoses and quarantines "had nothing to do with J.K." Dkt. 18 at 71:15–21 & 81:22–25. Yet she also testified that Covid-19 causes fevers, which are a trigger for J.K.'s epilepsy, *id.* at 79:12–18, and that J.K. was scheduled for surgery in late January 2022 and needed to be Covid-negative to keep the surgery date. In her declaration submitted in opposition to summary judgment, Young clarifies that her daughter's December 2021 diagnosis related to J.K.'s disability because of J.K.'s need to be Covid-negative in advance of the surgery date.

Monroe County Human Resources Director Ed Smudde testified that dispatchers like Young were among those employees considered critical and "even if someone had tested

positive, I believe there was state guidance that would allow them to come to work," preferably masked.  Dkt. 19 at 54:5–13.  Young testified that the county health department advised her to quarantine but could not recall who she spoke to about the situation.[4]

## G. Thompson ends Young's employment with the Communications Center

On January 17, 2022, Young asked Thompson if she could return to full-time employment, with seniority, matched pay to her job with the victim advocacy organization, and with her previous schedule rotation.  Thompson testified that he did not act on the request right away so that Young would reflect on whether she truly wanted to return to full-time employment "[a]nd because I'm not going to go back – I don't want to go back to what we were doing.  You know, calling in sick and whatnot and just not being here."  Dkt. 20 at 51:13–18.  Thompson also testified that January to March 2022 was a particularly stressful time for the center because it was "hammered" by 2,000 to 3,000 additional calls a month from recently arrived refugees at nearby Fort McCoy.  *Id.* at 66:8–19.

Young followed up with Thompson on March 6, 2022, about full-time dispatcher vacancies, noting that she was no longer with the victim advocacy organization.  Three days later, on March 9, Thompson responded that he had decided not to bring Young back full time or to retain her as an on-call dispatcher.  Thompson acknowledged Young's skills as a dispatcher and said she was a "wonderful person," but he "had serious doubts about [her] reliability and

---

[4] The record contains a letter from a health care provider excusing Young from work between December 1 and December 17, 2021, due to her daughter's positive Covid test result.  Dkt. 23-14 at 1.  There is a quarantine order from the Monroe County Health Department issued to J.K.'s parents, Dkt. 23-15 at 2, and a quarantine order issued to S.Y.'s parents, Dkt. 29-4 at 2, both advising a 14-day quarantine through December 25, 2021 and January 24, 2022, respectively.  The record also contains isolation orders requiring M.K. to stay home until December 11, 2021 and J.K. to stay home until January 12, 2022.  Dkt. 29-1 at 2 & Dkt. 29-3 at 2.

dependability." Dkt. 23-22 at 2. He explained that Young had been "absent so many times [over the previous two years] that" she missed the equivalent of six months of work and that it had been "mostly miss" since she returned to on-call status. *Id.* Thompson specified that "[w]hat really made [his] decision" was when Young had a coworker cover her four-hour shift on February 22, 2022, even though this meant her coworker would work a 16-hour day. *Id.*

On Young's performance evaluations from 2016 to 2020, all completed by her former supervisor, her attendance rating was either "meets" or "exceeds" expectations. Dkt. 23-9. Thompson testified that he did not ever talk to Young about a yearly review because she was "never" at the center, Dkt. 20 at 64:15–16, but was "sure" he had raised his attendance concerns with her in 2022, *id.* at 54:18–20. He recalled writing an "Employee Work Plan" for Young to address his concerns about her attendance, but the plan is unsigned and has a completion date of July 1, 2022, after Young's termination. Dkt. 23-27 at 2. Thompson could not recall "doing anything with it," and "guess[ed]" that he had raised the possibility of a plan with Young at some point. Dkt. 20 at 62:2–63:19.

When questioned about his termination decision, Thompson emphasized that dispatchers had to be present to do their jobs, and when he had to find someone to cover Young's shifts, it took "two people" "out of the game," *id.* at 56:8–12. Although Thompson acknowledged that "family comes first," he noted that "it doesn't come first when you don't do the paperwork for FMLA to make it happen. You're just gone." *Id.* at 57:9–13. He "care[d] about [Young's] family," but explained that this was "a separate topic from her reliability and dependability about being at work," and it was up to Young to figure out how to balance her various obligations. *Id.* at 71:13–17.

Thompson explained that Young's absences in 2022 had created a situation that was "absolutely stupid" and that "[a]nybody that has a work ethic would know they should have been fired a long time ago instead of being an empty chair." *Id.* at 56:13–19.  He stated that he did not "care if it's FMLA or just regular sick time.  If you take so much time off, time off is time off," and while FMLA is "protected," over a third of Young's absences "were uncovered days.  No requested absence.  Nothing." *Id.* at 32:12–25.  Thompson remarked that he had heard Young "was doing the same thing" at the victim advocacy organization that "she had been doing to us with not showing up, trying to get FMLA.  But FMLA doesn't work until after a year, so…" *Id.* at 68:1–6.

Young attests in her declaration that while J.K.'s epilepsy is now under control, it was not yet under control and required ongoing medical intervention and doctor visits when she was terminated.  She also attests to her "understanding" that other on-call dispatchers were promoted to full-time employment even though they also informally swapped shifts and to her "understanding and belief" that dispatchers Lindsay Cobb, Shelly Mueller, and Emily Becker were all promoted from on-call to full-time status without the county initiating any recruitment process, and that none of these dispatchers have a spouse or a child with a disability requiring caregiving.  Dkt. 28, ¶¶ 19, 21–26.

## H. Young's complaint

Young filed a charge of discrimination based on disability and the need for and use of FLMA leave with the EEOC and with the Wisconsin Department of Workforce Development on June 13, 2022.  The EEOC dismissed Young's charge and issued a "right to sue" letter on July 28, 2023.  Young filed this lawsuit on October 25, 2023.  *See* Dkt. 1.

The Wisconsin Department of Workforce Development notified Young on March 7, 2024, that her complaint would be dismissed unless she responded by March 27, 2024, that she wished to have her complaint investigated. Young did not respond, and her complaint was dismissed on April 11, 2024.

LEGAL STANDARD

Summary judgment is appropriate when there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether there are genuine factual disputes, the court examines the record in the light most favorable to the party opposing judgment and construes all reasonable inferences from the evidence in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). Mere conclusory allegations do not constitute evidence. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Further, disputed facts that are not outcome-determinative are not material and will not preclude summary judgment. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997).

ANALYSIS

Young asserts six claims. She brings failure-to-hire, wrongful termination, and disparate treatment claims under the ADA, and an associational disability discrimination claim under the Rehabilitation Act. Under the FMLA, Young brings interference and retaliation claims.

The court will address the ADA and Rehabilitation Act claims together before turning to Young's FMLA claims.

## A. Young's declaration

As a threshold matter, defendant objects to Young's declaration in opposition to summary judgment as a "sham" and moves to strike it. Dkt. 30 at 3–4 & Dkt. 36. The sham-affidavit or declaration rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (citing *Dunn v. Menard Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)); *see also Craig v. Wrought Washer Mfg., Inc.*, 108 F.4th 537, 543 (7th Cir. 2024) (noting that the court is permitted to "disregard" a sham affidavit that contradicts prior sworn testimony). The rule is to be applied with "great caution," and where the change is plausible or there is a suitable explanation for the change, the changed testimony goes to a witness's credibility rather than admissibility. *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016).

The county advances two arguments regarding Young's purported sham. First, it alleges inconsistencies in how Young described her family's Covid-19 diagnoses and how they affected J.K. Young agreed at her deposition that her other children's Covid-19 diagnoses "had nothing to do with" J.K., Dkt. 18 at 71:18–20, 81:22–25, but she also testified that a Covid diagnosis could affect his epilepsy in that fevers caused by the virus could trigger his epilepsy and that he needed to stay Covid-negative to keep a January 2022 surgery date. She then attested in her declaration that her daughter's December 2021 diagnosis did "relate" to J.K.'s disability in that he needed to remain Covid-free in advance of surgery. Dkt. 28, ¶ 7. At most, this is a clarification of previous testimony, not the sort of about-face that constitutes a sham. *See Miller v. Riverside RV Inc.*, 455 F. Supp. 3d 813, 819 (N.D. Ind. April 23, 2020) (rule is intended for

"incredible and unexplained" changes in testimony rather than favorable restatements of testimony, disagreement with testimony, testimony that supplies additional information, or contradictory testimony arguably supported by other testimony).

Second, the county alleges discrepancies in how Young described the practice of shift swapping at the center. Young testified at her deposition that the dispatchers had an informal shift swapping practice under the previous director, but the practice changed after Thompson became the director in mid-2021. She attested in her declaration that she herself engaged in that "pattern and practice," Dkt. 28, ¶ 4, which is not a contradiction at all.

The county also objects to Young attesting to the promotion of other on-call dispatchers based on her "understanding" or her "understanding and belief." This is a legitimate objection, and the court will disregard these paragraphs, cited above in the fact section, Dkt. 28, ¶¶ 19, 21–26. There is no independent evidentiary support in the record. And while Young's declaration indicates that she is generally "competent to testify to the facts set forth in this Declaration based on her own personal knowledge," Dkt. 28, ¶ 2, asserting specific facts based on understanding and belief "is not enough to satisfy the personal knowledge requirement for" affidavits and declarations. *Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000); *see also* Fed. R. Civ. P. 56(c)(4) (affidavits or declarations must be based on personal knowledge). Regardless, as explained below, these attestations about other on-call dispatchers are not helpful to any of Young's claims.

## B. Young's claims

### 1. The ADA

Young's ADA claims are premised on a theory of associational discrimination. Under the ADA, an employer is prohibited from "excluding or otherwise denying equal jobs or benefits

to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); *see also* 29 C.F.R. § 1630.8. While an employer is not required to provide a reasonable accommodation to a non-disabled worker to care for another person with a disability, *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012) (citing *Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004); 29 C.F.R. Pt. 1630, App. (§ 1630.8)), "the employer cannot [adversely treat] the employee for unfounded assumptions about the need to care for a disabled person," *id.* at 337. Young alleges that the county failed to promote her and fired her based on her association with her son with epilepsy.

To prevail on her ADA claims, Young must present evidence that the county's failure to promote her and its decision to terminate her was based on discriminatory intent. *Id.* at 338. To this end, the Seventh Circuit has endorsed a modified *McDonnell Douglas* burden-shifting framework for ADA association claims, under which a plaintiff must establish that: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by the county at the time to be related to someone with a disability; and (4) her case falls into one of the three relevant categories: expense, disability by association, or distraction. *Id.* at 336-37; *Larimer*, 370 F.3d at 701-02.

After making a prima facie case, "the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (internal citation omitted). To survive summary judgment on the issue of pretext, a plaintiff must point to evidence from which a reasonable

14

jury could conclude that the defendant is lying about its reason for taking the adverse employment action. *Consolino v. Dart*, 120 F.4th 1324, 1327 (7th Cir. 2024).

In ADA cases "the modified *McDonnell Douglas* test . . . requires the plaintiff to present evidence indicating it is more likely than not the employer took the adverse action *because of* the plaintiff's . . . association with a disabled individual." *Magnus*, 688 F.3d at 737 (internal quotation omitted and emphasis added). The Seventh Circuit has interpreted the ADA's "because of" language to require "but for" causation, meaning that the decision-maker would not have taken the adverse action "but for" the employee's protected classification. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020).

The county is entitled to summary judgment on Young's ADA claims because Young has failed to marshal evidence of discriminatory intent. The undisputed evidence shows that the county declined to promote Young and ultimately decided to terminate her, not due to her association with J.K., but due to concerns with her poor attendance. Even if some of the days she missed were to care for J.K., "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative." *Magnus*, 688 F.3d at 339. Because the undisputed record shows that the county had a legitimate, non-discriminatory reason for its actions, and Young cannot show this reason was pretextual, summary judgment is appropriate on these claims. Also, and independently, Young has failed to marshal evidence to support her claim for disparate treatment. So, summary judgment is appropriate on her disparate treatment claim for this additional reason.

### a. Associational discrimination based on assumed distraction

Young asserts that, even though she was qualified for the dispatcher position, the county took adverse action against her because Thompson believed that she would be too distracted

by J.K.'s epilepsy to do the job. This falls under the "distraction category" of associational discrimination. "This theory contemplates a scenario . . . where an employee is fired because she is a bit inattentive on the job due to her child's . . . disability that requires her attention, but not so inattentive that she needs an accommodation to perform to her employer's satisfaction." *Magnus*, 688 F.3d at 336.

The problem with Young's claim is that the undisputed record shows that she was not just "a bit inattentive," but that she was entirely absent from shifts that she said she would work. Young signed up to work nine shifts in January 2022 but worked none of them. She signed up to work two shifts in February 2022 but worked only one of the two and left after working only 1.25 hours of the other to help with a family business. Other dispatchers had to cover these shifts—and while her co-workers may have volunteered, covering Young's shifts meant longer hours on their part. This frequent shift swapping created difficulties for the center, which was already under stress from a higher-than-normal volume of calls. Young's chronic absences and the challenges with covering them were legitimate reasons for the county to decline to promote and, ultimately, to terminate Young. *Id.* (citing *Tyndall v. Nat'l Educ. Ctr.*, 31 F.3d 209, 214 (4th Cir. 1994) (termination based on assumptions regarding future absences related to a relative's care may give rise to liability, but termination resulting from an employee's past absences does not)).

The parties debate whether and which of Young's absences were related to caring for J.K. Resolving these debates would require credibility determinations, which the court cannot make on summary judgment. But the court need not weigh in on these disputes because the reasons for Young's absences are immaterial to the inquiry. Even if Young took every single absence to care for J.K. (the record shows she did not), the county was not required to

16

accommodate her leave schedule.  *Id.* at 338 (citing *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 489 (6th Cir. 2011) (even if the employee's poor work performance was due to wife's illness, it's irrelevant because the employee was not entitled to a reasonable accommodation)). Ultimately, it does not matter why Young was absent—all that matters is that she repeatedly backed out of shifts, requiring others to fill in for her.

Young argues that Thompson's concerns with her reliability and dependability were pretextual but fails to support this theory.  The timing of events is not on Young's side.  When Young was a full-time dispatcher, her applications for leave were always granted, and Thompson's contemporaneous correspondence shows that he wished Young and her family well.  It was not until after Young voluntarily left her full-time position and repeatedly failed to show for on-call shifts that adverse action was taken.  Thompson testified that he decided to terminate Young's employment after she agreed to cover a co-worker's shift on February 21, 2022, but texted another co-worker that morning to cover those hours, causing that dispatcher to work a 16-hour day.  Young offers nothing to meaningfully question this account.

According to Young, Thompson was supportive of her need for leave on paper but was "visibly unhappy" in person and angry that he could not "force her" to cover shifts.  Dkt. 18 at 113:19–21 & Dkt. 25 at 15–16.  There can be no dispute that Thompson was generally concerned about Young's absenteeism to the point that he drafted an Employee Work Plan, but there is no evidence that he exhibited any specific concern about her need to care for J.K. Young's perceptions of Thompson, combined with his comments on her taking FMLA leave, are enough to support the inference that he disliked her taking leave, which factors into the FMLA claims, discussed below, but they are not enough to support a similar inference of discriminatory intent based on Young's association with her disabled child.

Young also notes that the county never formally raised the issue of attendance with her in an annual review, through an employee work plan, or any other means. This may call into question the sensibility of the center's management style, but it ultimately fails to create a dispute as to the legitimacy of the county's stated reasons for not promoting and ultimately terminating Young. Again, timing is not on Young's side. By the time she was terminated, she was only a few months into her on-call position, and of the eleven shifts she had signed up for, she worked only one and, even then, left early to help out with a family business. Even if there had been ample time for a review, Young fails to support that she was entitled to one as an at-will employee.

At bottom, this is not a situation where "the employee [wa]s [simply] somewhat inattentive at work because h[er] . . . child has a disability that requires h[er] attention," *Larimer*, 370 F.3d at 700. Indeed, there is no dispute that when Young showed, she was very good at her job. But this is not a case about simple inattentiveness. Young was repeatedly absent and, thus, failing to do the job entirely. On these undisputed facts, summary judgment as to Young's associational discrimination claims is warranted. *Magnus*, 688 F.3d at 339; *cf. Equal Emp. Opportunity Comm'n v. American Flange*, Case No. 21 C 5552, 2024 WL 4202719, at 3 (N.D. Ill. Sept. 16, 2024) (in general, an employer may treat regular attendance as an essential job function and need not accommodate erratic or unreliable attendance).

### b. Disparate treatment

Young's theory of disparate treatment is underdeveloped and unsupported. She asserts that other on-call dispatchers who also relied on informal shift swapping were hired as full-time dispatchers. Dkt. 25 at 13. Young presumably refers to the dispatchers she names in her declaration as allegedly having no caregiver responsibilities. *See id.* (citing to proposed findings

of fact supported by Young's declaration in ¶¶ 82–87).  As explained above, these assertions are insufficiently supported by Young's mere "understanding and belief," and there is no related independent record evidence to credit.  Regardless, even taking what Young asserts as true, Young does not also establish that any of these individuals had attendance records similar to hers.  *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (the plaintiff must show that a coworker "had a comparable set of failings" to be similarly situated).  Young presents insufficient evidence to sustain this claim, and defendants are entitled to summary judgment on it.

### 2.  The Rehabilitation Act

Young also brings an associational disability claim under the Rehabilitation Act.  Under § 504 of the Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).  The Rehabilitation Act expressly incorporates the standards and procedures applicable to claims brought under the ADA.  *Id.* § 794(d).

The county argues that the Act does not recognize associational claims like Young's.  The Seventh Circuit has not spoken on the issue, but other courts have.  The Second Circuit, for example, has interpreted associational standing broadly, holding that associational discrimination claims may be brought under the Rehabilitation Act because § 749(a)(2) authorizes "*[a]ny* person aggrieved by any act or failure to act by any recipient of Federal assistance" to bring suit.  *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 279–80 (2d Cir. 2009) (emphasis added).  Specifically, the court held that the minor children of a deaf patient

who missed school for several days because they were conscripted to interpret for their father had standing to bring their associational claims under the Rehabilitation Act. *Id.* at 273, 279.

By contrast, the Eleventh Circuit takes a more restrictive view of associational standing. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1144 (11th Cir. 2014). The facts in *McCullum* are similar to those in *Loeffler*: hospital staff relied in part on a deaf and mute patient's parents and deaf sister to communicate with him. *Id.* at 1138. But the *McCullum* court, after reading the "person aggrieved" language in context of the entire Act, concluded that non-disabled persons may seek relief under the Act "only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *Id.* at 1143–1144. Because the plaintiffs had not alleged that the defendants "excluded, denied benefits to, or discriminated against [them] because of their association with [the patient]," the Eleventh Circuit concluded that they lacked standing to sue under the Act. *Id.* at 1145.

Young alleges personal discrimination because of her association with her disabled son, so under either the *Loeffler* or *McCullum* standards, Young qualifies. And although the Seventh Circuit has yet to weigh in, the court will assume the Act applies for purposes of resolving the county's motion.

The county next argues that Young's Rehabilitation Act claim is not viable because it is not a recipient of federal funding and thus falls outside the Act's purview. *See* 29 U.S.C. § 794(a). Young responds that the county and its 911 dispatch center received federal funding via the Coronavirus Aid, Relief, and Economic Security Act (CARES) when the county passed a resolution on February 23, 2022, to distribute those funds. *See* Dkt. 29-5 at 3 (County Board of Supervisors minutes indicating the resolution passed). Young was terminated on March 9,

20

2022, and the record is unclear as to whether, when, and how federal CARES Act funds were actually distributed and used by the county. Drawing all reasonable inferences in favor of the nonmoving party as the court must at the summary judgment stage, *see Anderson*, 477 U.S. at 249, Young has done enough to show there is a genuine dispute of material fact regarding the county's receipt of federal funding at the time of the alleged adverse employment actions, so the court will also consider her claim under the Rehabilitation Act.

The parties do not analytically distinguish Young's ADA and Rehabilitation Act claims, and neither will the court. *McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024) (courts construe and apply the statutes in a consistent manner and the evaluation of a plaintiff's claims under both uses the same analysis). For the reasons explained above, the court will grant summary judgment in the county's favor on this discrimination claim as well.

### 3. The FMLA

Young also brings interference and retaliation claims under the FMLA. The FMLA "provides eligible employees the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period because of a serious health condition, including the serious health condition of a family member," and it "affords employees protection in the event that they are retaliated against because of their choice to exercise their rights under the Act." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) (citing 29 U.S.C. § 2615(a)). "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008)).

### a. Interference

Young theorizes that the county interfered with her future use of FMLA by using her past FMLA leave and possible future need for FMLA leave as a basis for its adverse employment decisions. Dkt. 25 at 18–19. To establish an FMLA interference claim, an employee must show that: (1) the employee was eligible for FMLA protections; (2) the employer was covered by FMLA; (3) the employee was entitled to leave under FMLA; (4) the employee provided sufficient notice of intent to take FMLA leave; and (5) the employer interfered with, restrained, or denied FMLA benefits to which employee was entitled. *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022). The denial of FMLA benefits is not required to show an FMLA interference violation—interference or restraint alone is sufficient. *Id.*

Young cannot satisfy all of the elements of this claim. It is undisputed that Young was not eligible for FMLA leave when she was terminated, meaning that she cannot satisfy the first, third and fourth elements of her claim—eligibility, entitlement and proper notice. Young speculates that, had she not been terminated, she would have eventually worked sufficient hours to qualify for FMLA leave, she "very likely" would have used it, and Thompson fired her in part to avoid that possibility. Dkt. 25 at 19. But "[s]peculation cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motor Finance*, 105 F.4th 939, 946 (7th Cir. 2024). That Young may have eventually qualified for and used FMLA leave to care for J.K. is an insufficient foundation for her interference claim, so the court will grant summary judgment in defendant's favor on this claim.

### b. Retaliation

Young's retaliation claim fares better. Retaliation claims under the FMLA require three elements: (1) the employee engaged in statutorily protected activity; (2) the employer took

adverse action against the employee; and (3) the protected activity caused the adverse action. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

To succeed on her retaliation claim, Young need not prove that "retaliation was the *only* reason for [the employment decision]; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor'" in the county's decision not to promote or hire her. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022) (quoting *Lewis*, 523 F.3d at 741–742). "A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012) (citing *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). "The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Page v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

Young has presented minimally sufficient evidence that, if credited, would allow a reasonable jury to find in her favor on this claim. She had previously taken FMLA leave, including 84 hours in February 2021 to care for her son, and was therefore a member of a protected class, and she was subject to adverse employment actions when she was denied promotion and fired. Her claim thus turns on causation. Timing does not weigh in her favor, given that she does not claim to have used FMLA leave after November 2021, when she resigned from full-time employment and about four months before her termination. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("where a significant intervening event separates an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail."); *see also id.* at 966 (the court "typically allow[s]

no more than a few days to elapse between the protected activity and the adverse action."). Nor, as explained above, has Young presented sufficient evidence of similarly situated dispatchers being treated differently.

But Thompson's mixed statements and attitude about Young's use of FMLA leave generally could support an inference that he held her past use of FMLA leave against her regardless of her reason for needing such leave. Young testified that Thompson's in-person demeanor was not support of her leave requests. At his deposition, Thompson stated that he understood FMLA was protected leave, but he also suggested that Young lacked work ethic, that she should have been fired a long time ago, and that she had done "the same thing" to another employer by "not showing up, trying to get FMLA."[5]  Dkt. 20 at 68:1–6.

It may be that Thompson was simply speaking out of frustration given how busy the center was in early 2022, but trying to get full-time employment and securing benefits including FMLA leave is not unlawful. How to weigh and interpret Thompson's comments against the circumstances of this case is of course a task for the jury. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (a district court may not weigh conflicting evidence or make credibility determinations, both of which are in the province of the jury).

Because Young has made a sufficient evidentiary showing to create a reasonable inference of retaliation based on her use of FMLA leave, the court will deny the defendant's motion for summary judgment as it relates to that claim.

---

[5] Defendant objects to the admissibility of this statement about Young's use of leave with another employer as not based on Thompson's personal knowledge. Dkt. 31, ¶ 77. Indeed, Thompson notes that his comment is based on something he heard. The court considers the comment not for its truth, but as a possible reflection of Thompson's attitude towards Young's use of FMLA leave.

ORDER

IT IS ORDERED that:

1. Plaintiff Amanda Young's motion for leave to file a sur-reply, Dkt. 33, is GRANTED.

2. Defendant Monroe County's request for leave to file a sur-sur-reply is GRANTED, and its motion to strike plaintiff's declaration is GRANTED in part.  Dkt. 36.

3. Defendant's motion for summary judgment, Dkt. 21, is DENIED in part as to plaintiff's FMLA relation claim and GRANTED in part as to her remaining claims.

Entered June 10, 2025.

BY THE COURT:

/s/

_____

ANITA MARIE BOOR
Magistrate Judge

25